SA:MKP

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

JOHN WOLF,

          Defendant.

- - - - - - - - - - - - -X

**15M1104**

COMPLAINT

(T. 18, U.S.C. § 2252(a)(2);
T. 21, U.S.C. §§ 841(a)(1), 846)

EASTERN DISTRICT OF NEW YORK, SS:

    AARON SPIVACK, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

    On or about and between September 2013 and November 16, 2015, both dates being approximate and inclusive, within the Southern District of New York and elsewhere, the defendant JOHN WOLF did knowingly possess and distribute any visual depiction, the production of such visual depiction having involved the use of one or more minors engaging in sexually explicit conduct and such visual depiction was of such conduct, using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce or which contains materials which have been mailed or so shipped or transported, by any means including by computer.

    (Title 18, United States Code, Section 2252(a)(2)).

    On or about and between July 2014 and October 2014, both dates being approximate and inclusive, within the Eastern District of New York, the Southern District of

2

New York and elsewhere, the defendant JOHN WOLF, together with others known and unknown, did knowingly and intentionally conspire to possess with intent to distribute a controlled substance, which offense involved a substance containing methamphetamine, a Schedule II controlled substance, contrary to Title 21, United States Code, Section 841(a)(1).

(Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(A)).

The source of your deponent's information and the grounds for his belief are as follows:

1.  I am a Special Agent with the FBI. I have been employed by the FBI since 2006 and am currently assigned to the Violent Crimes Against Children Unit of the FBI New York Office's Criminal Branch. For approximately five years I have been assigned to investigate violations of criminal law relating to the sexual exploitation of children, including investigations into the production, receipt, possession, and/or distribution of child pornography, as well as the sexual enticement of minors. I have gained expertise in this area through training in classes and daily work related to these types of investigations. As a result of my training and experience, I am familiar with the techniques and methods of operations used by individuals involved in criminal activity to conceal their activities from detection by law enforcement officers. As part of my responsibilities, I have been involved in the investigation of numerous child pornography cases and have reviewed thousands of photographs depicting children (less than eighteen years of age) being sexually exploited by adults. Through my experience in these investigations, I have become familiar with methods of determining whether a child is a minor. I have also gained expertise regarding the use of computers and other electronic devices in connection with crimes against children. I have received training relating to the use of computers and other electronic devices by offenders and gained expertise

3

through participating in numerous cases in which computers and other electronic devices were used to facilitate crimes against children.

2. I am familiar with the information contained in this affidavit based on my personal participation in the investigation, my review of documents, my training and experience, and discussions I have had with other law enforcement personnel concerning the creation, distribution and proliferation of child pornography. Additionally, statements attributable to individuals herein are set forth in sum and substance and in part.

## PROBABLE CAUSE

### A. Investigation and the Narcotics Trafficking

3. In March 2015, a target of the investigation, referred to herein as CS-1, was arrested at John F. Kennedy International Airport ("JFK"), located in Queens, New York, while transporting 1,844 grams of methamphetamine into New York City from California. CS-1 was subsequently charged with a violation of Title 21 USC §§ 841(a)(1) and 841(b)(1)(A), conspiracy to distribute narcotics, and is currently awaiting trial. Subsequent to his arrest, CS-1 began meeting with representatives of the United States Attorney's Office for the Eastern District of New York (the "Office") and agents of the FBI and the Drug Enforcement Administration ("DEA"), during which meetings CS-1 provided information about other individuals involved in illegal activity, including the federal offenses set forth above.[1]

4. During meetings with the government, CS-1 advised the government that WOLF, a former criminal associate of CS-1, was involved in significant illegal conduct,

---

[1] CS-1 has not pled guilty but has provided information that has been corroborated by other information obtained during the investigation. CS-1 is cooperating in the hopes of receiving a cooperation agreement with the Office.

4

including (1) narcotics trafficking, involving the use and distribution of methamphetamine distributed by the defendant, and (2) the possession and production of child pornography.

5. CS-1 advised that, between September and October 2014, he provided WOLF, who is employed as a dentist in Manhattan, with large quantities of methamphetamine in exchange for dental services WOLF would provide in return to CS-1.

6. From at least July 2014 until October 2014, CS-1's source of supply for the methamphetamine was located in Los Angeles, California. During that time, CS-1 would pick up methamphetamine in Los Angeles and transport it to New York in his luggage on planes that landed at JFK. During this time period, CS-1 provided methamphetamine to approximately ten customers in the New York and Philadelphia areas, including WOLF, for their own personal use and further distribution.

7. CS-1 advised that during his visits to WOLF's office, he also witnessed WOLF and his employees using methamphetamine. CS-1 would also use methamphetamine with WOLF during those visits.

8. CS-1 also advised that WOLF had shown him images on WOLF's cellular phone of infants and toddlers being sexually abused by adults, including images of infants and toddlers being penetrated by penises of adult men. WOLF also told CS-1 that he is HIV positive and would have unprotected sex with his sexual partners.

9. WOLF further indicated that he had, at times, punctured holes in condoms in an intentional attempt to spread the HIV virus to his sexual partners.

10. CS-1 also advised that WOLF told him that he was actively involved in underground sex parties at various locations in New York City, including in Brooklyn, where participants would engage in sexual intercourse with animals.

5

### B. Consensual Recordings Between the Defendant and CS-1

11. From October through November 2015, at the direction and under the supervision of law enforcement, CS-1 consensually recorded a number of conversations between CS-1 and WOLF that took place at WOLF's dental office. During these meetings, CS-1 recorded WOLF discussing, among other things, (1) his current and historical use and distribution of methamphetamine, (2) his participation in bestiality, (3) his interest in child pornography, and (4) his risk to the general public.

12. During these recorded conversations, which are set forth herein in summary, WOLF admitted to CS-1 that he continued to use and distribute narcotics, including methamphetamine. WOLF also discussed methods by which he was able to pass a urinalysis, in spite of his drug use. During one of the meetings WOLF retrieved what CS-1 believed to be methamphetamine from a hidden container and smoked the methamphetamine in CS-1's presence.

13. WOLF also was recorded discussing his past sexual encounters with animals, and WOLF showed CS-1 videos on his phone depicting bestiality.

14. WOLF also was recorded discussing a sexual encounter with an adult male in which WOLF claimed to have drugged the victim in an effort to sexually assault him. Specifically, WOLF advised that the victim had initially asked WOLF to wear a condom during sex. WOLF then advised that he administered a "slam of K" to the victim which knocked the victim "out" by giving him "booty bumps" and "blood slams." I know from my experience as an agent with the FBI and discussions with agents from DEA that the term "K" is a reference to "Special K" or "ketamine," a medication that is used mainly for starting and maintaining

anesthesia, but that is also used illegally as a recreational hallucinogenic. WOLF also stated that he continued to puncture condoms when having sex with other individuals.

15. During these conversations, at the direct and under the supervision of law enforcement agents, CS-1 also advised WOLF of an individual, whom CS-1 identified as his "roommate," who CS-1 indicated was also sexually interested in children, had previously engaged minors in sexual conduct, and had an interest in child pornography. Unbeknownst to WOLF, the "roommate" was an undercover FBI agent (the "UCA"). WOLF inquired as to where the roommate obtained child pornography. WOLF also expressed his interest in learning more from the roommate about various child pornography websites.

B. **Consensual Recordings Between the Defendant and FBI Undercover Agent**

16. On November 11, 2015, CS-1 introduced the UCA to WOLF at WOLF's office. After their meeting, WOLF contacted CS-1 by text and advised that he "would like the name of those websites!"—referring to child pornography websites they had previously discussed.

17. On November 15, 2015, the UCA contacted WOLF via text message indicating that he had received WOLF's number from CS-1 and wanted to stop by. WOLF agreed and advised the UCA to stop by at his office the next day, November 16, 2015.

18. On November 16, 2015, the UCA met with WOLF in WOLF's office. The UCA was wearing a recording device. During their conversation, WOLF informed the UCA that he had previously used the basement of the office for sex parties.

19. The UCA told WOLF that he had heard that WOLF was interested in child pornography "websites." WOLF advised the UCA that he preferred more perverted child pornography sites. WOLF and the UCA discussed child pornography together. WOLF

7

told the UCA that WOLF had child pornography on a flash drive. WOLF offered the UCA the flash drive containing child pornography. WOLF also offered to show the UCA some of the child pornography from the flash drive.

20. WOLF plugged the flash drive into a computer, ran a cord from the computer to a large display screen, and projected the child pornography on the large screen display for the UCA to view. WOLF played child pornography for approximately 35 minutes. In general, the child pornography depicted young girls, ranging in approximate age of 5-13, engaging in sexual acts with other children and adults. One video in particular consisted of an underage girl whose hand and leg were tied to a stick or broom while the girl can be observed being digitally penetrated. Other videos included depictions of toddlers being sexually abused by adult men and prepubescent girls performing oral sex on each other. While watching the child pornography, WOLF and the UCA discussed the videos. At various times WOLF audibly moaned and made comments such as "oh my God" and "that's some twisted shit." WOLF also referred to the child pornography as "jerk off material." WOLF also described additional child pornography files that he possessed. WOLF stated that he gets particularly "excited" by specific child pornography videos, and described a video as depicting an eight year old "retarded" girl engaged in sex.

21. WOLF again offered to provide the UCA with child pornography, and stated he had an extra flash drive onto which he could download child pornography files for the UCA. Thereafter, WOLF transferred approximately 23 video files containing child pornography to a flash drive and gave it to the UCA.

22. The affiant has reviewed the flash drive WOLF provided to the UCA. Of the 23 files, 22 of them are viewable and those 22 are consistent with being child

8

pornography and generally depict young children engaged in sexually explicit conduct.

Descriptions of three of the clips contained on the flash drive are as follows:

    a.    "babyshivid 2Yo Slave.mpg" is a video approximately 3 minutes and 11 seconds in length. The video depicts a female child, approximately two years in age wearing a mask covering the child's face, with cut outs allowing the child to see. An adult male fondles the child who appears to be crying. The adult male strips the child down exposing her vagina and masturbates the child and engages the child in oral sex. The adult male then inserts his penis into the child's mouth.

    b.    "GOOD! 2YO GIRL GETTING RAPED DURING DIAPER CHANGE – Babyshivid-Pussy Pounded Pthc Pedo Child Fuck (kiddy ddoggprn naked b3ddogg little girl young kiddyporn realkiddy chid sex.mpg" is a video, approximately 2 minutes and 44 seconds in length. The video depicts a fully nude female child, approximately two to four years in age being vaginally penetrated by an adult male's penis. The male then ejaculates on the girl's vagina and anus.

    c.    "real underage fuck cum baby 2yo rape crys Babyshivid hussyfan r@ygold ptjc-2Yo Toddler Naked On Mans Lap (Pthc Pedo Babyfuck) 1yo 2yo 3yo 4yo.mpg" is a video file approximately five minutes and 46 seconds in length and is a compilation video of several different clips. The video begins by depicting a fully nude female child, approximately two to three years in age, sitting on an adult male's lap. The male is masturbating the girl and digitally penetrating her. The male then inserts his penis into the girl's vagina and engages the girl in vaginal sex with the male's penis. The girl appears to be wincing in pain. The next clip of the video depicts an adult male engaging a female child, approximately two to four years, in age in vaginal penetration with his penis. The girl's legs appear to be bound by rope. The remaining clips all depict adult men using their penis to vaginally and orally penetrate girls, approximately two to four years of age. In some of the clips the girls legs are bound by rope. In some clips the man ejaculates on the child.

    WHEREFORE, your deponent respectfully requests that the defendant JOHN WOLF be dealt with according to law. I further request that the Court order that this complaint, as well as any arrest warrant issued in connection with this complaint, be filed under

9

seal. Public filing of this document could result in a risk of flight by WOLF, as well as jeopardize the government's ongoing investigation.

Special Agent Aaron Spivack
Federal Bureau of Investigation

Sworn to before me this
19th day of November, 2015

THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK